## *PRELIMINARY PRINT*

# VOLUME 598 U. S. PART 2

### PAGES 739–758

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 1, 2023

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

## UNITED STATES ET AL. EX REL. SCHUTTE ET AL. *v.* SUPERVALU INC. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 21–1326.   Argued April 18, 2023—Decided June 1, 2023*

In these cases, petitioners have sued retail pharmacies under the False Claims Act (FCA), 31 U. S. C. §3729 *et seq.*   The FCA permits private parties to bring lawsuits in the name of the United States against those who they believe have defrauded the Federal Government, §3730(b), and imposes liability on anyone who "knowingly" submits a "false" claim to the Government, §3729(a).   Here, petitioners claim that respondents—SuperValu and Safeway—defrauded two federal benefits programs, Medicaid and Medicare.   Both Medicaid and Medicare offer prescription-drug coverage to their beneficiaries, and both often cap any reimbursement for drugs at the pharmacy's "usual and customary" charge to the public.   But, according to petitioners, SuperValu and Safeway for years offered various pharmacy discount programs to their customers—yet reported their higher retail prices, rather than their discounted prices.   Petitioners also presented evidence that the companies believed their discounted prices were their usual and customary prices and tried to prevent regulators and contractors from finding out about their discounted prices.   In sum, petitioners claim that the evidence shows that respondents thought their claims were inaccurate yet submitted them anyway.

Two essential elements of an FCA violation are (1) the falsity of the claim and (2) the defendant's knowledge of the claim's falsity.   The District Court ruled against SuperValu on the falsity element—finding that its discounted prices were its usual and customary prices and that, by not reporting them, SuperValu submitted false claims.   However, the court granted SuperValu summary judgment based on the scienter element, holding SuperValu could not have acted "knowingly."   In a separate case, the court granted Safeway summary judgment on that same basis.   The Seventh Circuit affirmed in both cases, relying heavily on *Safeco Ins. Co. of America* v. *Burr*, 551 U. S. 47—a case that interpreted the term "willfully" in the Fair Credit Reporting Act.   As the Seventh Circuit read *Safeco*, the companies could not have acted "knowingly" if

---

*Together with No. 22–111, *United States et al. ex rel. Proctor* v. *Safeway, Inc.*, also on certiorari to the same court.

their actions were consistent with an objectively reasonable interpretation of the phrase "usual and customary." Thus, the Seventh Circuit concluded, the companies were entitled to summary judgment even if they actually thought that their discounted prices were their "usual and customary" prices (and thus thought their claims were false).

*Held*: The FCA's scienter element refers to a defendant's knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed. Pp. 749–758.

(a) The FCA's text and common-law roots demonstrate that the FCA's scienter element refers to a defendant's knowledge and subjective beliefs. The FCA sets out a three-part definition of the term "knowingly" that largely tracks the traditional common-law scienter requirement for claims of fraud: Actual knowledge, deliberate ignorance, or recklessness will suffice. See §3729(b)(1)(A). Each term focuses on what the defendant thought and believed: "Actual knowledge" refers to what the defendant is aware of. "Deliberate ignorance" encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statements' truth or falsity. And "[r]eckless disregard" captures defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway. These forms of scienter track the common law of fraud, which generally focuses on the defendant's lack of an honest belief in the statement's truth. Restatement (Second) of Torts §526, Comment *e*. The focus is on what a defendant thought when submitting a claim—not what a defendant may have thought *after* submitting it. Pp. 749–752.

(b) Even though the phrase "usual and customary" may be ambiguous on its face, such facial ambiguity alone is not sufficient to preclude a finding that respondents knew their claims were false. That is because the Seventh Circuit did not hold that respondents made an honest mistake about that phrase; it held that, because *other* people might make an honest mistake, defendants' subjective beliefs became irrelevant to their scienter. Respondents make three main arguments to support that theory, but the Court finds none to be persuasive.

First, the facial ambiguity of the phrase "usual and customary" does not by itself preclude a finding of scienter under the FCA. Even if the phrase is ambiguous, respondents could have learned its correct meaning. Indeed, petitioners argue that the companies received notice that the phrase referred to their discounted prices, comprehended those notices, and then tried to hide their discounted prices.

Second, the companies' reliance on *Safeco*'s interpretation of the common-law definitions of "knowing" and "reckless" is misplaced, because *Safeco* interpreted a different statute with a different *mens rea* standard. 551 U. S., at 52. In any event, *Safeco* did not purport to set

forth the purely objective safe harbor that respondents invoke. "Nothing in *Safeco* suggests that [one] should look to facts"—or, here, legal interpretations—"that the defendant neither knew nor had reason to know at the time he acted." *Halo Electronics, Inc.* v. *Pulse Electronics, Inc.*, 579 U. S. 93, 106.

Finally, respondents contend their conduct is not actionable according to the common law of fraud incorporated by the FCA because common-law fraud does not encompass misrepresentations of law. Respondents then posit that their alleged claims were false only because their claims' falsity turned in part on the meaning of the phrase "usual and customary"—which, they argue, means that their claims would be false only as misrepresentations of law. But that does not follow. Even assuming that the FCA incorporates some version of this rule, respondents did not make a pure misrepresentation of law; they did not say, for example, "this is what 'usual and customary' means." Rather, they made a statement that implied facts about their prices, essentially saying "this is what *our* 'usual and customary' prices are." Petitioners' cases thus make out a valid fraud theory even under respondents' common-law rule. Pp. 752–757.

No. 21–1326, 9 F. 4th 455; No. 22–111, 30 F. 4th 649, vacated and remanded.

THOMAS, J., delivered the opinion for a unanimous Court.

*Tejinder Singh* argued the cause for petitioners. With him on the briefs were *John Timothy Keller, Dale J. Aschemann, Gary M. Grossenbacher, Glenn Grossenbacher, Paul B. Martins, Julie Webster Popham, James A. Tate,* and *Jason M. Idell.*

*Deputy Solicitor General Stewart* argued the cause for the United States urging reversal. With him on the brief were *Solicitor General Prelogar, Principal Deputy Assistant Attorney General Boynton, Benjamin W. Snyder, Michael S. Raab,* and *Charles W. Scarborough.*

*Carter G. Phillips* argued the cause for respondents. With him on the brief were *Kwaku A. Akowuah, Joshua J. Fougere, Jillian S. Stonecipher, Adam Kleven, Robert N. Hochman,* and *Tacy F. Flint.*\*

———————

*Briefs of *amici curiae* urging reversal were filed for the State of Connecticut et al. by *William Tong,* Attorney General of Connecticut, *Joshua Perry,* Solicitor General, *Michael K. Skold,* Deputy Solicitor General, *Gregory K. O'Connell,* Deputy Associate Attorney General, and *Eric*

JUSTICE THOMAS delivered the opinion of the Court.

The False Claims Act (FCA) imposes liability on anyone who "knowingly" submits a "false" claim to the Government. 31 U. S. C. § 3729(a). In some cases, that rule is straightforward: If a law authorized payment of $100 for "each" medical

*P. Babbs* and *Karla A. Turekian,* Assistant Attorneys General, by *Michelle A. Henry,* Acting Attorney General of Pennsylvania, and by the Attorneys General for their respective jurisdictions as follows: *Treg Taylor* of Alaska, *Rob Bonta* of California, *Philip J. Weiser* of Colorado, *Kathleen Jennings* of Delaware, *Brian L. Schwalb* of the District of Columbia, *Christopher M. Carr* of Georgia, *Anne E. Lopez* of Hawaii, *Kwame Raoul* of Illinois, *Theodore E. Rokita* of Indiana, *Brenna Bird* of Iowa, *Kris Kobach* of Kansas, *Aaron M. Frey* of Maine, *Anthony G. Brown* of Maryland, *Andrea Joy Campbell* of Massachusetts, *Dana Nessel* of Michigan, *Keith Ellison* of Minnesota, *Aaron D. Ford* of Nevada, *John M. Formella* of New Hampshire, *Matthew J. Platkin* of New Jersey, *Raúl Torrez* of New Mexico, *Letitia James* of New York, *Joshua H. Stein* of North Carolina, *Drew Wrigley* of North Dakota, *Gentner F. Drummond* of Oklahoma, *Ellen F. Rosenblum* of Oregon, *Peter F. Neronha* of Rhode Island, *Marty J. Jackley* of South Dakota, *Jonathan Skrmetti* of Tennessee, *Charity R. Clark* of Vermont, *Robert W. Ferguson* of Washington, and *Joshua L. Kaul* of Wisconsin; for the National Whistleblower Center by *Stephen M. Kohn, Michael D. Kohn,* and *David K. Colapinto*; for Taxpayers Against Fraud Education Fund by *Samuel J. Buffone, Jr.*; and for Sen. Charles E. Grassley by *Eric R. Havian.*

Briefs of *amici curiae* urging affirmance were filed for the Advanced Medical Technology Association et al. by *Douglas Hallward-Driemeier*; for the American Hospital Association et al. by *Michael R. Dreeben, Jenya Godina,* and *Anton Metlitsky*; for the Chamber of Commerce of the United States of America et al. by *John P. Elwood, Craig D. Margolis, Jayce Born, Andrew R. Varcoe, Erica Klenicki, Michael A. Tilghman II, James C. Stansel,* and *Melissa B. Kimmel*; for CTIA–The Wireless Association et al. by *Kyle D. Hawkins, William T. Thompson,* and *Drew F. Waldbeser*; for the National Association of Chain Drug Stores by *Craig Y. Lee* and *Daniel Stefany*; for the National Defense Industrial Association et al. by *Beth S. Brinkmann, Matthew F. Dunn, Peter B. Hutt II, Krysten Rosen Moller,* and *S. Conrad Scott*; for the Professional Services Council et al. by *David W. Ogden, Ronald C. Machen, David M. Lehn,* and *Felicia H. Ellsworth*; for the Taxpayers' Federation of Illinois et al. by *C. Eric Fader, Karl A. Frieden,* and *Frederick Nicely*; and for the Washington Legal Foundation by *John M. Masslon II* and *Cory L. Andrews.*

test, and a doctor knows that he did five tests but submits a claim for ten, then he has knowingly submitted a false claim. But sometimes the rule is less clear. If a law authorized payment for only "customary" medical tests, some doctors might be confused when it came time for billing. And, while some doctors might honestly mistake what that term means, others might correctly understand whatever "customary" meant in this context—and submit claims that were inaccurate anyway.

The cases before us today involve a legal standard similar to that latter example: In certain circumstances, pharmacies are required to bill Medicare and Medicaid for their "usual and customary" drug prices. And, critically, these cases involve defendants (respondents here) who may have correctly understood the relevant standard and submitted inaccurate claims anyway. The question presented is thus whether respondents could have the scienter required by the FCA if they correctly understood that standard and thought that their claims were inaccurate.

We hold that the answer is yes: What matters for an FCA case is whether the defendant knew the claim was false. Thus, if respondents correctly interpreted the relevant phrase and believed their claims were false, then they could have known their claims were false.

I

The FCA permits private parties to bring lawsuits in the name of the United States—called *qui tam* lawsuits—against those who they believe have defrauded the Federal Government. §3730(b). Petitioners here brought two such lawsuits against respondents, which are companies that operate hundreds of retail drug pharmacies nationwide. In No. 21–1326, respondents are a group of companies that we collectively call SuperValu; in No. 22–111, respondent is Safeway, Inc. According to petitioners, respondents overcharged Medicare and Medicaid programs for years when seeking re-

imbursement for prescription drugs that the programs covered.   In doing so, petitioners argue, respondents defrauded the Government and violated the FCA.

A

The claims at issue here relate to two federal benefits programs: Medicaid, which establishes a cooperative federal-state program that provides medical assistance to certain low-income individuals, see 42 U. S. C. §1396 *et seq.*, and Medicare, which provides federally funded health insurance coverage to individuals who are 65 or older or who are disabled, see 42 U. S. C. §1395 *et seq*.

As relevant here, States' Medicaid plans may offer outpatient prescription-drug coverage to qualifying individuals. §1396d(a)(12).   However, the Federal Centers for Medicare and Medicaid Services (CMS) has promulgated regulations that limit the amount these programs may reimburse for certain drugs.   See 42 CFR §447.512(b)(2) (2021).   Those regulations limit any reimbursement to the lower of two amounts, one of which is the healthcare provider's "usual and customary charges [for the drug] to the general public."   *Ibid.*   State Medicaid agencies likewise typically reimburse pharmacies for the lowest of different amounts, one of which is often the pharmacy's "usual and customary charge" to the public. See CMS, Medicaid Covered Outpatient Prescription Drug Reimbursement Information by State, Quarter Ending September 2022 (Nov. 16, 2022), https://www.medicaid. gov/medicaid/prescription-drugs/state-prescription-drug-resources/medicaid-covered-outpatient-prescription-drug-reimbursement-information-state/index.html.

Through Medicare Part D, the Government also offers prescription-drug coverage to beneficiaries.   See 42 U. S. C. §1395w–101 *et seq.*; 42 CFR pt. 423.   To administer that coverage, CMS awards contracts to private plan sponsors. See 42 U. S. C. §1395w–115; 42 CFR §§423.315, 423.329. Those plan sponsors, in turn, enter contracts with pharma-

cies (sometimes through middlemen called pharmacy benefit managers). Many of the contracts at issue here limited any reimbursement to the pharmacy's "usual and customary" price.

The bottom line is that, when respondents submitted reimbursement claims to these entities, they often were required to charge and disclose their "usual and customary" price for that drug.[1] But, according to petitioners, respondents reported higher prices to these entities than the ones that they usually and customarily charged to the public.

B

According to petitioners, in 2006, respondents' competitor, Walmart, began offering 30-day supplies of many drugs for $4.[2] To compete with Walmart, SuperValu and Safeway adopted price-match programs in which their pharmacies would match a competitor's lower price at a customer's request. SuperValu's pharmacies would then automatically apply that price to future refills of the drug for those customers. Meanwhile, Safeway also adopted a "membership" discount program through which customers received discounted generic drug prices (often $4 for a 30-day supply). To enroll in that membership program, customers had to fill out a form with only basic information; petitioners argue that Safeway often already had this information on file. SuperValu's programs continued until 2016; Safeway's continued until 2015.

Respondents' discount programs turned out to be popular. Though the exact extent of that popularity is disputed, peti-

---

[1] The FCA covers claims presented both to the Federal Government and to a federal "contractor, grantee, or other recipient" when, as relevant here, the money is "to be spent or used . . . to advance a Government program." 31 U. S. C. § 3729(b)(2)(A).

[2] Respondents, of course, demur and portray themselves in a far more sympathetic light. We do not resolve any of those factual disputes today, as we resolve only a legal question arising from the grant of summary judgment to respondents. In this posture, we must take the evidence in petitioners' favor.

tioners have presented evidence that the discounted prices comprised a majority of sales for many drugs to customers who paid in cash (and not through insurance) for at least some years during the programs' operation. For example, according to petitioners, a majority of SuperValu's 2012 cash sales for 44 of its 50 top-selling prescription drugs were made at those discounted prices. And, according to petitioners, 88% of Safeway's 2014 cash sales for its top 20 generic drugs were at discounted rates.

Petitioners contend that those discounted prices were actually respondents' "usual and customary" prices—and that, rather than submitting those lower prices for reimbursement, respondents instead reported their higher, nondiscounted prices. For example, petitioners have presented evidence that Safeway charged just $10 for 94% of its cash sales for a 90-day supply of a cholesterol drug between 2008 and 2012. Yet Safeway apparently reported prices as high as $108 as "usual and customary" during that time. And petitioners presented evidence that, at least at some times and for some drugs, SuperValu made more than 80% of its cash sales for prices less than what it disclosed as its "usual and customary" price.

To be sure, the phrase "usual and customary" on its face appears somewhat open to interpretation. But petitioners contend that respondents were informed that their lower, discounted prices were their "usual and customary" prices, believed their discounted prices were their "usual and customary" prices, and tried to hide their discounted prices from regulators and contractors. Petitioners have presented evidence that they claim supports that theory. For example, both SuperValu and Safeway received a notice in 2006 from a pharmacy benefit manager stating that the phrase "usual and customary" refers to discounted prices; Safeway apparently received the same message from state Medicaid agencies. And executives at both companies raised concerns

about letting state agencies or pharmacy benefit managers find out about their discounted prices.

For example, some emails between SuperValu executives described their discount program as a "stealthy approach" and noted concern for the "integrity" of their "U&C price" claims. App. to Pet. for Cert. in No. 21–1326, p. 67a (internal quotation marks omitted). An executive at Safeway similarly stated that "[w]e may have some issues with U&C" and that "if you [match a] price offer, that becomes your usual and customary [price] for that day." 30 F. 4th 649, 667 (CA7 2022) (internal quotation marks omitted). Other documents directed Safeway's employees to match Walmart prices, but cautioned that employees should not "*put any of this in writing to stores* because our official policy is we do not match." *Id.*, at 666. Petitioners argue that this and other evidence show that respondents thought that their claims were inaccurate yet submitted them anyway.

C

Before proceeding, some context about how these cases reached us is useful to understand the question presented. The FCA (as relevant here) imposes liability on those who "knowingly presen[t] . . . a false or fraudulent claim for payment or approval." § 3729(a)(1)(A). Thus, two essential elements of an FCA violation are (1) the falsity of the claim and (2) the defendant's knowledge of the claim's falsity.

In SuperValu's case, the District Court ruled against SuperValu on the falsity element—it determined that SuperValu's discounted prices were its "usual and customary" prices and that, by not reporting them, SuperValu submitted claims that were false. But, the District Court then granted summary judgment for SuperValu based on the scienter element, holding SuperValu could not have acted "knowingly." Soon after, it granted Safeway summary judgment on the same basis.

The Seventh Circuit affirmed. 9 F. 4th 455 (2021). In doing so, it relied heavily on *Safeco Ins. Co. of America* v. *Burr*, 551 U. S. 47 (2007)—a case that interpreted the term "'willfully'" in the Fair Credit Reporting Act (FCRA), *id.*, at 52. Specifically, the Seventh Circuit read *Safeco* to dictate a two-step inquiry for ascertaining whether a defendant acted recklessly or knowingly. At step one, the Seventh Circuit took *Safeco* to ask whether a defendant's acts were consistent with any objectively reasonable interpretation of the relevant law that had not been ruled out by definitive legal authority or guidance. This step, the Seventh Circuit held, applied regardless of whether the defendant actually believed such an interpretation at the time of its claims. Only if the defendant's acts were not consistent with any objectively reasonable interpretation would the court proceed, at step two, to consider the defendant's actual subjective thoughts. Thus, under the Seventh Circuit's approach, a claim would have to be objectively unreasonable, as a legal matter, before a defendant could be held liable for "knowingly" submitting a false claim, no matter what the defendant thought.

Turning to the facts here, the Seventh Circuit held that respondents were entitled to summary judgment because their actions were consistent with an objectively reasonable interpretation of the phrase "usual and customary." Specifically, the court reasoned that the phrase *could* have been understood as referring to respondents' retail prices, not their discounted prices—even if the phrase, correctly understood, referred to their discounted prices. It thus did not matter whether respondents thought that their discounted prices were actually their "usual and customary" prices. What mattered, instead, was that someone else, standing in respondents' shoes, may have reasonably thought that the retail prices were what counted.

We granted certiorari, see 598 U. S. —— (2023), to resolve that legal question: If respondents' claims were false and

they actually thought that their claims were false—because they believed that their reported prices were not actually their "usual and customary" prices—then would they have "knowingly" submitted a false claim within the FCA's meaning? Or is the Seventh Circuit correct—that respondents could not have "knowingly" submitted a false claim unless no hypothetical, reasonable person could have thought that their reported prices were their "usual and customary" prices?

It is equally important to recognize what we did *not* grant certiorari to review: We are not reviewing the meaning of the phrase "usual and customary" or whether any of respondents' claims were, in fact, inaccurate or otherwise false. Nor are we reviewing whether respondents actually thought that the phrase "usual and customary" referred to their discounted prices. Nor, for that matter, are we reviewing any factual disputes about what respondents did or did not believe or do. These cases come to us from the grant of summary judgment to respondents on one discrete legal issue, and we granted certiorari to resolve only that issue.

## II

Based on the FCA's statutory text and its common-law roots, the answer to the question presented is straightforward: The FCA's scienter element refers to respondents' knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed. And, even though the phrase "usual and customary" may be ambiguous on its face, such facial ambiguity alone is not sufficient to preclude a finding that respondents knew their claims were false.

### A

We start, as always, with the text of the FCA. See *Universal Health Services, Inc.* v. *United States ex rel. Escobar*, 579 U. S. 176, 187 (2016). Here, the FCA defines the term "knowingly" as encompassing three mental states: First,

that the person "has actual knowledge of the information," §3729(b)(1)(A)(i).  Second, that the person "acts in deliberate ignorance of the truth or falsity of the information," §3729(b)(1)(A)(ii).  And, third, that the person "acts in reckless disregard of the truth or falsity of the information," §3729(b)(1)(A)(iii).  In short, either actual knowledge, deliberate ignorance, or recklessness will suffice.[3]

That three-part test largely tracks the traditional common-law scienter requirement for claims of fraud.  See Restatement (Second) of Torts §526 (1976); Restatement (Third) of Torts: Liability for Economic Harm §10 (2018).  For example, one widely cited English decision, *Derry* v. *Peek*, [1889] 14 App. Cas., articulated the rule as follows: "[F]raud is proved when it is shewn that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false." *Id.*, at 374 (judgment of Lord Herschell).  And, capturing the FCA's use of the term "deliberate ignorance," that decision noted that an action for fraud would lie if "a person making a false statement had shut his eyes to the facts, or purposely abstained from inquiring into them."  *Id.*, at 376.  Those standards have been cited and widely adopted by American courts in the century since.  See 3 D. Dobbs, P. Hayden, & E. Bublick, Law of Torts §665, p. 645 (2d ed. 2011) (Dobbs); Restatement (Second) of Torts, App. §526, Reporter's Note.

That the text of the FCA tracks the common law is unsurprising because, as we have recognized, the FCA is largely a fraud statute.  See *Escobar*, 579 U. S., at 187–188, and n. 2.  Indeed, the FCA was first enacted in 1863 to " 'sto[p] the massive frauds perpetrated by large contractors during the Civil War.' "  *Id.*, at 181.  To this day, the FCA refers to " 'false or *fraudulent*' " claims, pointing directly to "the common-law meaning of fraud."  *Id.*, at 187 (emphasis

---

[3] The FCA also specifies that the term " 'knowingly' . . . require[s] no proof of specific intent to defraud."  §3729(b)(1)(B).

added).   In the absence of statutory text to the contrary, we would assume that "'Congress intends to incorporate the well-settled meaning'" of such a common-law term.  See *ibid.*  And here, the FCA's definition of "knowingly" confirms that assumption by largely tracking the common-law scienter standards for fraud.

On their face and at common law, the FCA's standards focus primarily on what respondents thought and believed. First, the term "actual knowledge" refers to whether a person is "aware of" information.[4]  See *Intel Corp. Investment Policy Comm.* v. *Sulyma*, 589 U. S. ——, —— – —— (2020); *Escobar*, 579 U. S., at 191 ("A defendant can have 'actual knowledge' that a condition is material without the Government expressly calling it a condition of payment"); Black's Law Dictionary 784 (5th ed. 1979) ("to understand," or "the perception of the truth"); Restatement (Second) of Torts §526, and Comment *c*.  Second, the term "deliberate ignorance" encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity.  See *Global-Tech Appliances, Inc.* v. *SEB S. A.*, 563 U. S. 754, 769 (2011); Black's Law Dictionary, at 672 ("[v]oluntary ignorance"); *Derry*, 14 App. Cas., at 376.  And, third, the term "reckless disregard" similarly captures defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway.  See Black's Law Dictionary, at 1142; *Farmer* v. *Brennan*, 511 U. S. 825, 836 (1994); Restatement (Third) of Torts §10, Comment *c*.[5]

--------

[4] Respondents contend that "information" can refer only to purely factual information, like the number of drugs sold.  But the definition of "information" is broad, referring to all "knowledge obtained from investigation, study, or instruction."  See Webster's New Collegiate Dictionary 592 (1975); see also American Heritage Dictionary 674–675 (1981).  And, in this context, the scienter requirement of the FCA is plainly directed to the falsity of the claims submitted.  §3729(a)(1)(A).

[5] In some civil contexts, a defendant may be called "reckless" for acting in the face of an unjustifiably high risk of illegality that was so obvious that it should have been known, even if the defendant was not actually

Again, that tracks traditional common-law fraud, which ordinarily "depends on a subjective test" and the defendant's "culpable state of mind." *Id.*, § 10, Comment *a.* What typically matters at common law is whether the defendant made the false statement "without belief in its truth or recklessly, careless of whether it is true or false." Restatement (Second) of Torts § 526, Comment *e.* If a defendant knows that he "lack[s an] honest belief" in the statement's truth, that is often enough to establish scienter for fraud. *Id.*, Comment *d*; Dobbs § 665, at 647.

Both the text and the common law also point to what the defendant thought when submitting the false claim—not what the defendant may have thought *after* submitting it. As noted above, the text encompasses those who "knowingly presen[t] . . . a false or fraudulent claim"; the term "knowingly" thus modifies present-tense verbs like "presents." § 3729(a)(1)(A). As such, the focus is not, as respondents would have it, on *post hoc* interpretations that might have rendered their claims accurate. It is instead on what the defendant knew when presenting the claim. See also Restatement (Second) of Torts § 526, Comment *e* ("It is enough that being conscious that he has neither knowledge nor belief in the existence of the matter he chooses to assert it as a fact"); accord, *Halo Electronics, Inc.* v. *Pulse Electronics, Inc.*, 579 U. S. 93, 105 (2016) ("[C]ulpability is generally measured against the knowledge of the actor at the time of the challenged conduct").

### B

The difficulty here, however, is that the phrase "usual and customary" is, on its face, less than perfectly clear. We assume (as the District Court ruled in SuperValu's case) that

conscious of that risk. See *Farmer*, 511 U. S., at 836–837. We need not consider how (or whether) that objective form of "recklessness" relates to the FCA today because, as noted above, it is enough to say that the FCA's standards can be satisfied by a defendant's subjective awareness of the claim's falsity or an unjustifiable risk of such falsity.

respondents' "usual and customary" prices were their discounted ones; if so, it might have been a forgivable mistake if respondents had honestly read the phrase as referring to retail prices, not discounted prices.   But the Seventh Circuit did not hold that respondents made an honest mistake; it held that, because *other* people might make an honest mistake, defendants' subjective beliefs became irrelevant to their scienter.   Respondents make three main arguments in support of that rule.   But none is persuasive.

1

Respondents first focus on the inherent ambiguity of the phrase at issue here, asserting that they could not have "known" that their claims were inaccurate because they could not have "known" what the phrase "usual and customary" actually meant.   The most that is possible, respondents posit, is that they took a (correct) guess.

We disagree.   Although the terms, in isolation, may have been somewhat ambiguous, that ambiguity does not preclude respondents from having learned their correct meaning—or, at least, becoming aware of a substantial likelihood of the terms' correct meaning.   To illustrate why, consider a hypothetical driver who sees a road sign that says "Drive Only Reasonable Speeds."   That driver, without any more information, might have no way of knowing what speeds are reasonable and what speeds are too fast.   But then assume that the same driver was informed earlier in the day by a police officer that speeds over 50 mph are unreasonable and then noticed that all the other cars around him are going only 48 mph.   In that case, the driver might know that "Reasonable Speeds" are anything under 50 mph; or, at the least, he might be aware of an unjustifiably high risk that anything over 50 mph is unreasonable.   Indeed, if the same police officer later pulled the driver over, we imagine that he would be hard pressed to argue that some other person might have understood the sign to allow driving at 80 mph.   The same analy-

sis applies here.   According to petitioners, respondents received notice that the phrase "usual and customary" referred to their discounted prices (in some cases, it seems, from the same entities to which they reported their prices).   And, according to petitioners, respondents comprehended those notices and then tried to hide their discounted prices.   If that is true, then perhaps respondents actually knew what the phrase meant; or perhaps respondents were aware of an unjustifiably high risk that the phrase referred to their discounted prices.   And, if that is true, then respondents may have known that their claims were false.   The facial ambiguity of the phrase thus does not by itself preclude a finding of scienter under the FCA.

2

Second, like the Seventh Circuit, respondents rely on *Safeco*.   They contend that *Safeco* already interpreted the common-law definitions of "knowing" and "reckless" and that it did so by looking first at whether the defendant's "reading of the statute" was "objectively unreasonable."   551 U. S., at 69.   Accordingly, respondents conclude that, because the FCA has the same common-law terms, it should be read with the same, objective common-law focus.

This argument fails twice over.   First, *Safeco* interpreted a different statute, the FCRA, which had a different *mens rea* standard, " 'willfully.' "   *Id.*, at 52 (quoting 15 U. S. C. § 1681n(a)).   While *Safeco* did reference the common law's standards for "knowing" and "reckless" conduct, see 551 U. S., at 59–60, 68–69, its interpretation was ultimately tied to the FCRA's particular text.   To take *Safeco* as establishing categorical rules for those terms would accordingly "abandon the care we have traditionally taken to construe such words in their particular statutory context."   *Jerman* v. *Carlisle, McNellie, Rini, Kramer & Ulrich, L. P. A.*, 559 U. S. 573, 585 (2010).   And, as explained above, the FCA's scienter standards are plainly satisfied by a defendant's conscious belief that his claims are false.

Opinion of the Court

Second, *Safeco* did not purport to set forth the purely objective safe harbor that respondents invoke. To the contrary, *Safeco* stated that a person is reckless if he acts "*knowing* or having reason to know of facts which would lead a reasonable man to realize" that his actions were substantially risky. 551 U. S., at 69 (emphasis added; internal quotation marks omitted). Or, as *Safeco* alternatively put it, the common law of recklessness *contained* an objective standard because it encompassed actions involving "an unjustifiably high risk of harm that is *either* known *or* so obvious that it should be known." *Id.*, at 68 (emphasis added; internal quotation marks omitted); see also Restatement (Second) of Torts § 500, Comment *a* (1964) ("Recklessness may consist of either of two different types of conduct. In one the actor knows . . . of facts which create a high degree of risk"). Thus, as we have stated previously, "[n]othing in *Safeco* suggests that we should look to facts that the defendant neither knew nor had reason to know at the time he acted." *Halo Electronics*, 579 U. S., at 106.[6] By a similar token here, we do not look to legal interpretations that respondents did not believe or have reason to believe at the time they submitted their claims.

3

Respondents make one more argument, approaching the issue from a somewhat different angle. They contend that, at common law, their claims would not be actionable as fraudulent even if their reported prices were not accurate under the correct meaning of "usual and customary." Their argu-

---

[6] Respondents read a footnote in *Safeco* to establish the sort of purely objective safe harbor for which they argue. See *Safeco*, 551 U. S., at 70, n. 20. But that footnote—even if it does deem subjective intent to be irrelevant in the FCRA context—certainly was not meant to establish the general rule for the terms "knowing" or "reckless" in all contexts. Cf. *Halo Electronics*, 579 U. S., at 106, n. (distinguishing the footnote in the patent-infringement context).

ment is as follows: At common law, misrepresentations of law are not actionable; only misrepresentations of fact are. Because the FCA incorporates the common law of fraud, it embodies that same limitation. And the claims here would have been knowingly false only because respondents correctly understood what "usual and customary" meant. Therefore, respondents conclude, their reports were not false because of any misrepresentation of fact; to the contrary, their claims would have been false only because of their view of the law.

But those premises do not support that conclusion. To be sure, many courts appear to have stated—as a general rule— that misrepresentations of law are not actionable at common law. See Restatement (Second) of Torts § 545; W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 109, pp. 758–759 (5th ed. 1984) (Prosser & Keeton). So, for example, if a defendant had told the plaintiff, "your claim will be dismissed because federal courts lack jurisdiction over claims like that," that representation might not be actionable as a fraud. See *ibid.*; *Utah Power & Light Co.* v. *Federal Ins. Co.*, 983 F. 2d 1549, 1556 (CA10 1993). Varying rationales appear to have been given for this rule, including that such statements are of mere opinion and that no one could justifiably rely on them. See Dobbs § 677, at 688.

For purposes of these cases, we assume without deciding that the FCA incorporates some version of this rule; even then, the rule has significant limits on its own terms. As relevant here, statements involving some legal analysis remain actionable if they "carry with [them] by implication" an assertion about "facts that justify" the speaker's statement. Restatement (Second) of Torts § 545, Comment *c*; see also Prosser & Keeton § 109, at 759. So, as a contrasting example, a person might be liable for falsely stating that "the plumbing work that I did on your house complied with state law." See *Sorenson* v. *Gardner*, 215 Ore. 255, 261, 334 P. 2d

471, 474 (1959). That is because such a statement says something about both the correct meaning of building codes *and* the facts about the home's construction. *Ibid.*; see also *Hoyt Properties, Inc.* v. *Production Resource Group, L. L. C.*, 736 N. W. 2d 313, 319 (Minn. 2007). And homeowners might justifiably rely on that latter representation about the facts, which thus could be actionable as fraud.

Respondents' disclosures here sound more like our hypothetical plumber, not our hypothetical legal advisor. Rather than saying, "this is what 'usual and customary' means," respondents essentially said, "this is what *our* 'usual and customary' prices are." In doing so, they plainly implied facts about their prices that were not known to the plan sponsors, pharmacy benefit managers, and state Medicaid agencies that received their claims. Petitioners' cases thus make out a valid fraud theory even under respondents' common-law rule.

*          *          *

Under the FCA, petitioners may establish scienter by showing that respondents (1) actually knew that their reported prices were not their "usual and customary" prices when they reported those prices, (2) were aware of a substantial risk that their higher, retail prices were not their "usual and customary" prices and intentionally avoided learning whether their reports were accurate, or (3) were aware of such a substantial and unjustifiable risk but submitted the claims anyway. § 3729(b)(1)(A). If petitioners can make that showing, then it does not matter whether some other, objectively reasonable interpretation of "usual and customary" would point to respondents' higher prices. For scienter, it is enough if respondents believed that their claims were not accurate.

We need not address any of the other factual or legal disputes involved in these cases, including whether petitioners have made a showing sufficient under the correct legal standard to preclude summary judgment. Nor do we need to ad-

dress any of the parties' policy arguments, which "cannot supersede the clear statutory text." *Escobar*, 579 U. S., at 192. We accordingly vacate the judgments below and remand these cases to the Seventh Circuit for further proceedings consistent with this opinion.

*It is so ordered.*

Page Proof Pending Publication

———————————

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None

———————————